# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

EUNA McGRUDER,                                )
                                             )
      Plaintiff,                           )
                                             )
v.                                           )     **Case No. 3:17-cv-01547**
                                             )     **Judge Aleta A. Trauger**
METROPOLITAN GOVERNMENT                       )
OF NASHVILLE AND DAVIDSON                      )
COUNTY, TENNESSEE d/b/a                        )
METROPOLITAN NASHVILLE                         )
PUBLIC SCHOOLS,                               )
                                             )
      Defendant.                           )

## MEMORANDUM

Before the court is plaintiff Euna McGruder's timely Rule 59(e) Motion to Alter or Amend [Reconsideration] (Doc. No. 28) ("Rule 59 motion"), seeking reconsideration of the ruling granting the defendant's Motion for Summary Judgment. For the reasons set forth herein, the motion will be granted.

## I.    PROCEDURAL HISTORY

McGruder filed suit against defendant Metropolitan Nashville and Davidson County, Tennessee ("Metro") in December 2017, asserting claims for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Doc. No. 1.)[1] The claims arise from the plaintiff's having been hired by Metro, and specifically the Metropolitan Nashville Public Schools ("MNPS"), as Executive Officer of Priority Schools in

---

[1] The case was initially assigned to Chief Judge Waverly Crenshaw but, pursuant to the division of the docket, transferred to Judge Eli J. Richardson on October 22, 2018. Judge Richardson recused himself following the filing of the Rule 59 motion, and the case was reassigned to the undersigned, with that motion pending, on July 16, 2020.

July 2015, and then fired in January 2016 immediately after reporting to MNPS agents her findings of race discrimination and "a hostile work environment [on the basis of, *inter alia*, race and racist leadership]" at one of the schools she had been hired to improve. (Doc. No. 1 ¶ 15.)

Metro filed its Motion for Summary Judgment in December 2018. It sought dismissal of the race discrimination claim on the basis that McGruder could not establish that she was replaced by a person outside her protected class or treated differently from any similarly situated employee, for purposes of a *prima facie* case of discrimination in violation of Title VII. It sought summary judgment on the retaliation claim on the basis that the plaintiff could not establish the element of a causal connection between her protected activity and termination for purposes of stating a *prima facie* case of retaliation and that, even if she did state a *prima facie* case, Metro offered legitimate, non-retaliatory reasons for the adverse action, and McGruder could not show that its reasons were pretextual. (Doc. No. 19, at 6–7.) McGruder filed a Response addressing these specific arguments. (*See, e.g.*, Doc. No. 28, at 18 ("Causation is the only element Defendant contends Plaintiff is unable to satisfy for the *prima facie* case of retaliation.").) Metro thereafter filed a Reply in which it reiterated its initial claims but also argued, for the first time, that the retaliation claim failed because the plaintiff could not show that she had opposed unlawful practices under Title VII. Its argument was based in part on the wording of the plaintiff's EEOC charge, which was not introduced into the court's record until the defendant filed it with its Reply.

The court granted summary judgment in favor of Metro on both the discrimination and retaliation claims. Specifically with respect to the retaliation claim, the court found that this claim failed because the plaintiff had not shown that she challenged conduct made illegal by Title VII, that is, "she has not shown evidence that she reported racial discrimination against

employees." (Doc. No. 36, at 11.) Instead, she "reported alleged *racial discrimination* against *students*, and *non-racial poor treatment* of *employees*." (*Id.*) Finding that summary judgment on this ground was warranted, the court did not reach the defendant's causation arguments.

The plaintiff promptly filed her Rule 59 motion. She does not challenge the dismissal of her discrimination claim. Instead, she challenges the dismissal of her retaliation claim, asserting that the court erred in granting summary judgment on the basis of an issue raised only in the defendant's Reply. She argues both that the issue should have been deemed waived and that, if the court were nonetheless inclined to consider the new argument, the plaintiff should have been provided advance notice and an opportunity to respond to it. The plaintiff also asserts that she was prejudiced by the dismissal on this basis, because the record establishes that she did engage in activity protected by Title VII. (Doc. No. 38.) The defendant filed a Response (Doc. No. 42), arguing that the plaintiff had ample notice and opportunity to address the argument raised in its Reply and that, regardless, the plaintiff cannot show as a factual matter that she engaged in protected conduct. Finally, the defendant also argues that, even if the court grants relief on the grounds asserted in the Rule 59 motion, it should nonetheless find that the defendant had legitimate, non-retaliatory reasons for terminating the plaintiff's employment and that the plaintiff cannot establish that these reasons were pretextual, for the reasons set forth in the original summary judgment briefing.

## II. STANDARD OF REVIEW

A motion under Rule 59(e) is not a vehicle for presenting new legal arguments that could have been raised before a judgment was issued or to reargue a case. *Leisure Caviar, LLC v. U.S. Fish & Wildlife Serv.*, 616 F.3d 612, 616 (6th Cir. 2010); *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 395 (6th Cir. 2007); *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998). Instead, a court may alter or amend a judgment under

Rule 59 based on: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice. *Leisure Caviar*, 616 F.3d at 615; *Roger Miller Music*, 477 F.3d at 395; *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005).

"The grant or denial of a Rule 59(e) motion is within the informed discretion of the district court, reversible only for abuse." *Scotts Co. v. Cent. Garden & Pet Co.*, 403 F.3d 781, 788 (6th Cir. 2005) (citation and internal quotation marks omitted), *abrogated on other grounds*, *Allied Indus. Scrap, Inc. v. OmniSource Corp.*, 776 F.3d 452 (6th Cir. 2015).

## III.    DISCUSSION

The court presumes familiarity with the underlying Memorandum Opinion and Order challenged by the Rule 59 motion and will not reiterate the factual background or legal standards articulated there, except as strictly necessary to rule on the pending motion.

### A.    Clear Error of Law

McGruder argues that it was a clear error of law to consider the issue of whether she had engaged in protected activity, because Metro waived that argument by not raising it in its initial brief and because McGruder was not provided notice and an opportunity to respond to that argument.

The court agrees that the plaintiff should have been given notice and an opportunity to respond to the new argument and new evidence. In the Sixth Circuit, matters raised for the first time in a reply are generally deemed to be waived for purposes of an appeal. *See, e.g.*, *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (refusing to consider on appeal an issue raised for the first time in a reply to a response to a motion to reconsider); *see also Malin v. JPMorgan*, 860 F. Supp. 2d 574, 577 (E.D. Tenn. 2012) (declining to address an issue raised initially in a reply brief, stating: "It is well-settled that a movant cannot raise new issues for the

first time in a reply brief because consideration of such issues 'deprives the non-moving party of its opportunity to address the new arguments.'" (quoting *Cooper v. Shelby Cty.*, No. 07-2283-STA-cgc, 2010 WL 3211677, at *3 (W.D. Tenn. Aug. 10, 2010)); *see also Cooper*, 2019 WL 3211677, at *3 n.14 (collecting district court cases refusing to consider arguments raised for the first time in reply briefs).

And, more importantly, while a district court nonetheless has the discretion to consider an issue raised in a reply brief, or new evidence submitted with a reply, it must first give the opposing party a reasonable opportunity to respond to the new argument or evidence. Failure to do so is an abuse of discretion. *See Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481–82 (6th Cir. 2003) (finding that the district court abused its discretion in granting summary judgment without allowing the plaintiff an "adequate opportunity to respond to new evidence" presented with a reply brief).

Metro's procedural arguments to the contrary are not well taken. For instance, while the plaintiff certainly could have sought permission to file a sur-reply or otherwise objected to the defendant's raising a new issue in its Reply, she had no affirmative obligation to do so. Neither the Federal Rules of Civil Procedure nor this court's Local Rules expressly allow for, or even contemplate, sur-replies. The plaintiff, instead, was justified in relying on the clear legal principle that an issue raised for the first time in a reply brief will be deemed waived. *Accord Gutierrez v. 78th Judicial Dist. Court*, No. 1:07-cv-12682009 WL 1507415, *1 n.2 (W.D. Mich. May 29, 2009) ("Ordinarily, this court will not consider arguments raised for the first time in a reply brief or surreply brief. . . . Part of the reason for this rule is that raising a new defense, argument, or evidence in a reply brief affords the other side no opportunity to respond. . . . The opposing party should not have to incur the cost and effort of additional filings—a motion for

leave to file a sur-reply, and the sur-reply itself—because the movants deliberately, or more likely inadvertently, held back part of their case."). The fact that some months passed between the filing of the Reply and the issuance of the court's opinion is of no significance.

The defendant also argues that the caselaw upon which the plaintiff relies is inapposite, because she "incorrectly relies upon cases where the courts awarded summary judgment on grounds that had not been raised or argued by *any* of the parties." (Doc. No. 42, at 2.) The cases cited by the plaintiff to which the defendant refers largely relied on Rule 56(f) (or its predecessor). *See, e.g.*, *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 829 (6th Cir. 2013) (noting that Rule 56 had been amended in 2010 specifically to permit a district court to grant a motion for summary judgment "on grounds not raised by a party" "[a]fter giving notice and a reasonable time to respond" (quoting Fed. R. Civ. P. 56(f)). While the defendant is correct that the referenced rule contemplates granting summary judgment in favor of a non-movant, on questions not addressed by either party, or even if no motion is filed at all, the point is that it requires "notice and a reasonable time to respond." Fed. R. Civ. P. 56(f). And the Rule is not precisely inapposite to the present circumstances. If a party fails to raise an issue until its reply, it effectively waives that issue for purposes of its motion for summary judgment, since the other party has not had the opportunity to respond to it. Thus, for all practical purposes, the procedural posture of the issue is the same as if it had not been raised at all as a basis for summary judgment. If a court is nonetheless inclined to grant summary judgment on that precise issue, it must give the opposing party "notice and a reasonable time to respond" under Rule 56(f). In this case, the court appeared to justify consideration of the newly raised issue on its conclusion that, "[w]hether or not it was proper for Defendant to first raise this issue in its reply brief rather than its initial brief, the Court [felt] constrained to address this issue and would have raised it *sua*

*sponte* even if the Defendant had not raised it." (Doc. No. 36, at 9 n.8.) Whether the court was relying on Rule 56(f) or on the defendant's Reply, the result is the same: it had an obligation to provide the plaintiff advance notice and an opportunity to respond before granting summary judgment on the basis of this argument.

The defendant justifies its (and the court's) reliance on the plaintiff's EEOC charge to grant summary judgment by arguing that the court was "permitted to rely upon the documents that had been presented" by the time the court issued its ruling. The defendant is correct, but the defendant did not introduce the EEOC charge into the court's record until it filed its Reply. As such, the charge constituted "new" evidence that the plaintiff herself had not addressed—or had need to address—in her Response to the Motion for Summary Judgment. It was subject to the rule pronounced by the Sixth Circuit in *Seay*: the plaintiff should have been given an opportunity to respond to it. *Seay*, 339 F.3d at 481–82. The fact that the plaintiff herself was aware of its existence and contents is, again, immaterial, since the defendant had not relied on it or referenced it in its initial Memorandum, or argued based on its wording that the plaintiff had not engaged in protected activity. The cases cited by the defendant in support of its position simply reiterate the principle that the plaintiff should have been given an opportunity to respond to new arguments raised, and new evidence relied upon, in the Reply *before* the court issued summary judgment on the basis of that argument. *See, e.g.*, *Smith*, 708 F.3d at 829 ("Entry of summary judgment on grounds not raised or argued by the parties is discourage[d], but the district court may do so in certain limited circumstances, so long as the losing party was on notice that [it] had to come forward with all of [its] evidence." (internal quotation marks and citations omitted)).

## B. Prejudice

Because the court clearly erred in granting summary judgment on a ground raised in the defendant's Reply without giving the plaintiff notice and an opportunity to respond, the next

question is whether the plaintiff was actually prejudiced by that error. *See id.* ("However, even when the district court fails to provide adequate notice to the party against whom summary judgment is granted, its judgment will be upheld unless the losing party can demonstrate prejudice."). Thus, to avoid summary judgment on this ground, the plaintiff, now having had the opportunity to respond, must establish the existence of a material factual dispute as to whether she engaged in protected activity.

As stated in the initial Memorandum Opinion, to establish a *prima facie* case of retaliation, in the absence of direct evidence, a plaintiff must first show that she engaged in protected activity, among other elements. (Doc. No. 36, at 9 (citations omitted).) Regarding this element, Title VII makes it illegal to discriminate against "any individual . . . because he has opposed any practice made an unlawful employment practice" under Title VII, "or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). While the plaintiff in this case engaged in protected activity by filing her EEOC charge, she does not allege that she was subjected to discrimination (retaliation) as a result of that act, since she had already been terminated by then. Rather, her claim is an "opposition" claim: that she engaged in protected activity when she opposed a violation of Title VII. *See McBroom v. Barnes & Noble Booksellers, Inc.*, 747 F. Supp. 2d 906, 914 (N.D. Ohio 2010) ("Title VII protects two types of retaliation actions, participation and opposition. . . . 'Opposition' activity occurs when the employee is opposing a violation of Title VII." (citing 42 U.S.C. § 2000e–3(a); *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989))).

To engage in "opposition" activity that falls within the protection of Title VII, the plaintiff must establish that she challenged an employment practice that she reasonably believed

was unlawful under Title VII. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000). Title VII does not restrict the manner or means by which an employee may oppose an unlawful employment practice. *See id.* ("Of critical import here is the fact that there is no qualification . . . on the party to whom the complaint is made known. . . ."). However, Title VII does not protect an employee if her opposition is merely a "vague charge of discrimination." *Booker*, 879 F.2d at 1313; *see also Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007). The Sixth Circuit has nonetheless clarified that, "[a]lthough vague complaints do not constitute opposition, '*Booker* does not . . . require that the plaintiff's complaint be lodged with absolute formality, clarity, or precision." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (quoting *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 F. App'x 624, 631 (6th Cir. 2013)).

The plaintiff argues that the record shows that she engaged in "multiple acts" that "are, and must be construed as, protected opposition to Title VII violations." (Doc. No. 38, at 6.) The evidence she cites in support of this assertion are her Declaration (Doc. No. 26-1), the "teacher statements" submitted to the defendant as part of the plaintiff's investigation into and report concerning the complaint about Principal Lorton (*e.g.*, Doc. No. 26-12, at 6), and the plaintiff's investigation "timeline" (Doc. No. 26-9, at 2). In addition, the plaintiff also argues that the EEOC charge, which asserted claims of both discrimination and retaliation, should not be narrowly construed as asserting only claims relating to the racially discriminatory treatment of students, that she clearly alleged protected conduct in her Complaint, and that the defendant itself, in its Answer, admitted that the plaintiff engaged in protected conduct. (*See* Doc. No. 9 ¶¶ 15, 16.) Finally, "[f]or the sake of argument," the plaintiff posits that, even if the teachers' reports of a hostile work environment *were* based only on their observations of race

discrimination against students by school administrators (which she denies), this would be sufficient to create a race-based hostile work environment for the teachers, for purposes of her *prima facie* case.

Indeed, the plaintiff alleged in her Complaint that she was tasked, in her capacity as Executive Officer of Priority Schools, with investigating an anonymous complaint against Kelli Lorton, the principal of Madison Middle School ("MMS"), alleging that she was "giving black kids way harsher punishment . . . than white kids" for "the same offense." (Doc. No. 1 ¶ 12.) McGruder's investigation into that complaint included interviews of staff and teachers at MMS, which revealed that MMS was "poorly run, permeated with discrimination, and was a workplace where teachers believed it was a hostile work environment [on the basis of, *inter alia*, race and racist leadership]." (*Id.* ¶ 15 (inexplicably, brackets appear in the original).) The defendant's Answer "admitted upon information and belief that that was part of Plaintiff's findings." (Doc. No. 9 ¶ 15.) McGruder allegedly "made her findings . . . known to agents of Defendant" on January 8, 2016. (Doc. No. 1 ¶ 16.) More specifically, she "informed Clarissa Zellers and Frank White that her investigation uncovered racial discrimination and hostile work environment." (*Id.*) The defendant admitted this statement too, though it denied knowing who Frank White was. (Doc. No. 9 ¶ 16.) The plaintiff alleges that she was fired for "speaking out about and opposing the discrimination and hostile workplace existing at ]MMS]." (*Id.* ¶ 17.)

In her Declaration, the plaintiff claims that, during a site visit to MMS on December 2, 2015, she "confirmed what [she] believed to be incidents of discrimination against students [and] hostile work environment by teachers." (Doc. No. 26-1 ¶ 26.) She made a preliminary report to HR/Talent Executive Katie Cour on December 7, 2015, stating that she had "discovered numerous incidents of discriminatory treatment and discipline of black students by school

administrators. . . . I also reported concerns from teachers about . . . discriminatory conduct, and accusations that [MMS] was a hostile work environment." (*Id.* ¶ 28.) She also spoke a few days later with Interim Chief of Leadership and Learning Vanessa Garcia, who told her that "this whole investigation is just stirring up a hornets' nest." (*Id.* ¶ 30.) She nonetheless continued her investigation.

On December 21, 2015, the plaintiff received a number of written statements from teachers, some of which were anonymous because the teachers feared being fired. (*Id.* ¶ 31.) The plaintiff characterizes these statements as including claims that MMS "was a hostile work environment." (*Id.*) On the same day, December 21, 2015, the plaintiff "separately spoke to Cour and Garcia" to discuss her "findings and beliefs that there were issues of hostile work environment and discrimination against teachers and students." (*Id.* ¶ 32.) Garcia and Cour were condescending and dismissive of her findings. (*Id.*) The plaintiff states that, in this conversation with Garcia and Cour, she "opposed the discrimination and hostile work environment existing at [MMS]" and told them that the "discrimination and hostile work environment at [MMS] needs to stop." (*Id.*)

On January 8, 2016, the plaintiff discussed the findings of her investigation with Clarissa Zellers and Frank White, at which time she told them that her investigation had "uncovered incidents of discrimination and unfair treatment of black students" and "that teachers reported concerns of a hostile work environment based on race, discrimination, and other grounds." (*Id.* ¶ 34.) She stated her belief that "something had to be done" about "the incidents of race-based discrimination, hostile work environment on behalf of teachers and students." (*Id.*)

On January 15, 2016, McGruder had a meeting with several MNPS administrators for the purpose of further discussing her findings. At this meeting, she again "shared [her] belief that

there was discriminatory conduct, a hostile work environment, and ineffective leadership pervading [MMS] under Principal Lorton." (*Id.* ¶ 35.) At approximately 4:00 p.m. that day, McGruder was fired, effective immediately, upon the recommendation of Garcia. She was told only that MNPS wanted to go in a "different direction with priority schools." (*Id.*) The plaintiff's Declaration purports to be signed "under penalty of perjury" pursuant to 28 U.S.C. § 1746, but it is undated. It was filed on January 28, 2019, at the same time as her Response to the Motion for Summary Judgment and Response to the defendant's Statement of Undisputed Material Facts.

The teacher statements that formed the basis for some of the plaintiff's investigative findings focus largely on poor leadership and ineffective student discipline at MMS generally. However, several of statements complained that black students suffered harsher punishment for the same misdeeds than white students, and one of the teachers also complained that Principal Lorton "often talk[ed] negatively about staff and kids. A lot of her comments are very racist and offensive!" (Doc. No. 26-12, at 6.) Another stated that MMS "is a place of chaos, unfairness, and racism. It is a place where teachers are definitely not supported." (*Id.* at 9.)

The plaintiff's undated "Timeline of events" documents her receipt of letters from various teachers "making discriminatory and hostile work environment claims" and her discussing these issues with Clarissa Zellars and Frank White on January 8, 2016. (Doc. No. 26-2, at 2.) It does not reference her verbal reports to Cour and Garcia on December 7 and 21, 2015.

Finally, the plaintiff's EEOC charge makes it clear that she is asserting claims of discrimination and retaliation based on race and "other." (Doc. No. 31.) In the narrative description of her claims, the plaintiff focused on the complaints that black students were being treated discriminatorily by school administration. She specifically stated: "I believe that I have been discriminated against and retaliated against because of my race (African American) and by

association for raising Civil Rights Violations on behalf of African American students in Metro Nashville Schools in violation of Title VII . . . ." (Doc. No. 31.)

The defendant did not choose to depose the plaintiff or, apparently, any other witnesses, so there is no evidence in the record regarding what the plaintiff's investigation unearthed or what her verbal reports consisted of other than the plaintiff's Declaration. The question is whether these allegations are sufficient at this juncture to establish that the plaintiff engaged in conduct protected by Title VII, that is, that she challenged an employment practice that she reasonably believed was unlawful under Title VII and her complaint was reasonably clear. *See Booker*, 879 F.2d at 1313 (finding the plaintiff's complaint about the plaintiff's "ethnocism" too vague to be protected); *Yazdian*, 793 F.3d at 645 ("Although vague complaints do not constitute opposition, *Booker* does not . . . require that the plaintiff's complaint be lodged with absolute formality, clarity, or precision.").

In *Yazdian*, the plaintiff was Iranian-American and a non-practicing Muslim who complained that his supervisor at work was creating a hostile work environment and discriminating against him. He was fired within six weeks of making that complaint. The court found that his statements to his supervisor, considered together, were not too vague to qualify as protected conduct, where he had allegedly complained about unlawful discrimination a number of times and then told his supervisor he was going to "respond with counsel" and "[b]ring a lawsuit," and he referenced the "hostile work environment." *Yazdian*, 793 F.3d at 646. The Sixth Circuit noted that "[t]hese statements—particularly the hostile-work-environment charge—put [defendant] on notice that [the plaintiff] believed that [his supervisor's] conduct was illegal." *Id.* This conclusion was based, at least in part, on the court's determination that "hostile work environment" is "a term of art, which refers to an unlawful employment practice under Title VII

that arises because of 'discriminatory intimidation, ridicule, and insult[s]' repeatedly directed at an employee on the basis of a protected characteristic." *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–16 (2002)). "Thus, an employee who complains that an employer is creating a 'hostile work environment' engages in Title-VII-protected activity when the context objectively reveals that the employee is using the expression to complain about repeated abusive discriminatory comments or treatment." *Id.* The Sixth Circuit concluded that the district court had erred in granting summary judgment on the basis of this element of the plaintiff's *prima facie* case, because "[a] reasonable jury could conclude that [the plaintiff] used and intended the phrase 'hostile work environment' to reference discriminatory treatment because he was aware of the legal significance of the term and meant it to be a complaint about national-origin or religious discrimination." *Id.*

In the case now before this court, it is clear that the plaintiff was focused primarily upon allegations that the administrators at MMS were generally incompetent leaders who were engaging in racially discriminatory treatment of students and were rude, unprofessional, and unresponsive in their dealings with MMS staff. To be protected under Title VII, a plaintiff's complaint must concern an employment practice prohibited by Title VII. The treatment of students (or students' behavior) does not concern an employment practice, and general complaints about a supervisor's rude and unprofessional behavior, though they address an employment practice, do not address an employment practice prohibited by Title VII. *See* 42 U.S.C. § 2000e-2(a) (barring employment discrimination on the basis of "race, color, religion, sex, or national origin").

That is not to say, however, that McGruder's entire focus was on the discriminatory treatment of students and the rude and unprofessional behavior toward employees by MMS's

leadership. The plaintiff's Declaration and the teacher statements she relies upon also substantiate her claim that she believed—and reported—that Lorton in particular had created a racially hostile work environment for the teachers who worked at the school, either because of the racist comments and racially disparate treatment of students and/or racist comments and discrimination directed toward the teachers. Whether a racially hostile work environment actually existed is immaterial; what matters is whether the plaintiff's reports to MNPS were sufficient to put the defendant on notice that the plaintiff reasonably believed that MMS administrators had engaged in conduct that was unlawful under Title VII. *See Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017) ("It's not necessary that the employee opposed a practice that is actually prohibited by Title VII; the employee need only have a good-faith and reasonable belief that he is opposing unlawful conduct." (internal quotation marks and citation omitted)).

Further, as in *Yazdian*, the context of McGruder's statements strongly suggests that she was using the term "hostile work environment" to refer, not only to intolerable working conditions caused by the rude and unprofessional behavior, poor leadership, and lack of discipline at the school, but also to "repeated abusive discriminatory comments or treatment," *Yazdian*, 793 F.3d at 646, against the teachers as well as the students. And, also as in *Yazdian*, "[a] reasonable jury could conclude that [the plaintiff] used and intended the phrase 'hostile work environment' to reference discriminatory treatment because [s]he was aware of the legal significance of the term and meant it to be a complaint about [race] discrimination." *Id.*; *see also id.* at 647 ("Many of Yazdian's complaints may reflect concerns about Sweatt's management style, rather than charges of discrimination. Indeed, the majority of Yazdian's complaints may pertain to Sweatt's management style. But we do not need to decide whether Yazdian's

complaints solely addressed Sweatt's management style because, when there are two reasonable ways to read the record, then summary judgment is not proper."). As in *Yazdian*, the court finds that the plaintiff's Declaration and the teacher statements suffice, under the totality of the circumstances presented here, to create a material factual dispute as to whether the plaintiff engaged in conduct protected by Title VII by reporting her belief that the school staff at MMS had been experiencing discrimination and a hostile work environment.

Metro raises several arguments in support of the court's original conclusion that the record did not show that the plaintiff had engaged in protected activity. First, Metro argues that the plaintiff is not entitled to rely on "self-serving, conclusory statements in response to a summary judgment motion," particularly when the statements "vary from Plaintiff's earlier sworn statements made to the EEOC." (Doc. No. 42, at 4.) In other words, the defendant argues that, because the plaintiff did not reference racially hostile work environment in her EEOC charge, she is barred from raising it in her Declaration. The defendant also argues that *Yazdian* is distinguishable, because the plaintiff there presented evidence from which it could reasonably be inferred that the employer understood that the plaintiff was opposing unlawful employment practices. Metro also argues that the court should disregard the plaintiff's Declaration in its entirety, on the basis that it is undated and, therefore, does not comply with 28 U.S.C. § 1746.[2]

As an initial matter, the court rejects the suggestion that the Declaration must be stricken because it is undated. The case cited for that proposition, *Bonds v. Cox*, 20 F.3d 697 (6th Cir.

---

[2] Metro also contends that its unsworn admissions in its Answer are not binding at the summary judgment stage. The court presumes, without deciding, that the defendant is correct and has not relied on the Answer as constituting evidence that the plaintiff engaged in protected conduct. The Answer is, however, evidence that the defendant had never contested the issue of protected conduct or put the plaintiff on notice that it did so until it filed its Reply brief, further substantiating the conclusion that the issue had effectively been waived by not being raised in the defendant's initial Memorandum.

1994), predates the 2010 amendment to Rule 56 that expands the scope of evidence upon which a court may rely in considering a motion for summary judgment. Now, a party may object to cited material on the grounds that it "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The plaintiff attests in her Declaration that the statements therein are sworn under penalty of perjury. The fact that the Declaration is undated means that it does not strictly comply with 28 U.S.C. § 1746, but it does not mean that the testimony cannot be presented in admissible form at trial—*e.g.*, by live testimony from the plaintiff.

Second, the court does not find the plaintiff's statements in her Declaration to be conclusory.[3] She states that she reported—on specific dates to specific people—that her investigation at MMS had revealed claims by teachers at the school of discrimination and a hostile work environment. (Doc. No. 26-1 ¶¶ 26, 28, 30–32, 34–35.) Notably, because the defendant had never previously questioned whether the plaintiff had engaged in protected conduct, her Declaration, prepared for the purpose of responding to the arguments in the Motion for Summary Judgment addressed to causation, had no need to focus with greater detail on the question of protected conduct.

Finally, regarding whether the Declaration conflicts with the EEOC charge, the law is clear that "a party cannot create a disputed issue of material fact by filing an affidavit that

---

[3] As this court has previously observed, the fact that a declaration is "self-serving," as the defendant claims, is not a reason to disregard it. Every declaration or affidavit is "self-serving" if it supports a declarant's position. That is, "[d]eposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving." *Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 374 (D.C. Cir. 2020) (quoting *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013)). As a result, "the term 'self serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Id.* (quoting *Hill*, 724 F.3d at 967). The admissibility of evidence offered in a declaration or affidavit turns on whether the statements are "made on personal knowledge" and "set out facts that would be admissible in evidence," Fed. R. Civ. P. 56(c)(4), not on whether the statements are "self-serving."

contradicts the party's earlier deposition testimony." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006). The plaintiff here has never been deposed, however, and her Declaration does not actually contradict her EEOC charge; it simply expands upon it.

And, notably, the defendant is not claiming that the plaintiff's retaliation claim must be dismissed for failure to exhaust administrative remedies related to that claim—nor would it have grounds for doing so. As the Sixth Circuit has recognized, while a claimant must exhaust administrative remedies before filing suit under Title VII, "[t]he policy or purpose of the exhaustion requirement is to trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation." *Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 471 (6th Cir. 2008) (internal quotation marks and citations omitted). "[T]he requirement is not meant to be overly rigid, nor should it result in the restriction of subsequent complaints based on procedural technicalities or the failure of the charges to contain the exact wording which might be required in a judicial pleading." *Id.* (internal quotation marks and citations omitted). "As a result, the EEOC complaint should be liberally construed to encompass all claims reasonably expected to grow out of the charge of discrimination." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006), *reh'g & reh'g en banc denied* (Nov. 13, 2006) (quotation marks and citation omitted). Thus, to establish exhaustion, a plaintiff must simply show "(1) that the Title VII claims were raised directly in her EEOC charge or (2) that the claims included in the EEOC charge would prompt the agency to uncover the other claims during an investigation reasonably expected to grow out of the charge of discrimination." *Hollimon v. Shelby Cty. Gov't*, 325 F. App'x 406, 411 (6th Cir. 2009) (internal quotation marks omitted).

In this case, the plaintiff checked the box for "retaliation" in her EEOC charge and

alleged that she believed she had been retaliated against "for raising Civil Rights Violations on behalf of African American students in Metro Nashville Schools in violation of Title VII of the Civil Rights Act of 1964, as amended." (Doc. No. 31.) Although she did not specifically reference her concerns about staff and teachers, she did reference her investigation. Consequently, a Title VII retaliation claim based on her investigation into and report regarding the teachers' complaints could reasonably be expected to grow out of the charge. While McGruder's failure to specifically address the teacher complaints in the EEOC charge may ultimately provide a basis for challenging her credibility, it does not provide a basis for disregarding her Declaration altogether.

In sum, the court concludes that the plaintiff has established at least a material factual dispute as to whether she engaged in activity protected by Title VII, for purposes of her *prima facie* case of retaliation. Because summary judgment on this basis is not warranted, the court must consider the other grounds raised in the defendant's motion to determine whether summary judgment on the retaliation claim is warranted.

### C.     Causation

Under the familiar burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff seeking to establish retaliation with indirect evidence carries the initial burden of establishing a *prima facie* case of discrimination or retaliation. *Id.* at 802; *see also George v. Youngstown State Univ.*, No. 19-3581, 2020 WL 4035164, at *8 (6th Cir. July 17, 2020). A causal connection between the protected activity and the materially adverse action is one of the elements of a *prima facie* case of retaliation. *See, e.g.*, *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).

"Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the

absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). For purposes of establishing a *prima facie* case, however, the plaintiff's burden is "not onerous" and can be met through "evidence that . . . the adverse action was taken shortly after the plaintiff's exercise of protected rights." *George*, 2020 WL 4035164, at *8 (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)). In *George*, the Sixth Circuit reaffirmed the principal that, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation." *Id.* (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). Moreover, at this stage, the court "may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action." *Taylor v. Geithner*, 703 F.3d 328, 339 (6th Cir. 2013) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc)).

If the plaintiff establishes a *prima facie* case, however, the burden then shifts to the defendant to "articulate some legitimate, non-discriminatory reason for [its] actions." *George*, 2020 WL 4035164, at *8 (quoting *Laster*, 746 F.3d at 730). If a defendant meets that challenge, to prevail on her claim, the plaintiff must prove by a preponderance of the evidence that her protected activity was the but-for cause of the adverse action. *Nassar*, 70 U.S. at 360. She "may do so by showing the offered reasons for [her] termination: (1) had no basis in fact; (2) did not actually motivate [the defendant's] conduct; or (3) were insufficient to explain this conduct." *Amos v. McNairy Cty.*, 622 F. App'x 529, 538 (6th Cir. 2015) (citing *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009). At the summary judgment stage, the plaintiff must simply point to evidence from which a reasonable jury could conclude that the defendant's

proffered reasons were not the true reasons for the employment decision, but merely a pretext for discrimination. *See id.* at 539 ("In other words, Amos must establish a genuine issue of fact . . . that would permit a jury to conclude that McNairy County fabricated its reasons for firing Amos.").

### 1. Prima Facie Evidence of Causal Connection

In this case, the exceedingly close temporal proximity between the plaintiff's allegedly protected conduct and the adverse action, standing alone, is sufficient to satisfy the plaintiff's burden at the *prima facie* stage. McGruder alleges that she made a preliminary report to Katie Cour on December 7, 2015 that she had uncovered "concerns from teachers about . . . discriminatory conduct, and accusations that [MMS] was a hostile work environment." (Doc. No. 26-1 ¶ 28.) A few days later, she also spoke with Vanessa Garcia, who allegedly told her that "this whole investigation is just stirring up a hornets' nest." (*Id.* ¶ 30.) She reported to both of them again on December 21, 2015. Shortly after these initial verbal reports, Garcia and/or Cour apparently began soliciting statements critical of the plaintiff's performance from other MNPS employees. (*See* Doc. No. 18-6, at 5, 13–27.) McGruder discussed her findings with Clarissa Zellers and Frank White on January 8, 2015, telling them that teachers at MMS had "reported concerns of a hostile work environment based on race, discrimination, and other grounds." (*Id.* ¶ 34.) She then met with MNPS administrators on January 15, 2016 for the express purpose of further discussing her findings. At that meeting, she again "shared [her] belief that there was discriminatory conduct, a hostile work environment, and ineffective leadership pervading [MMS] under Principal Lorton." (*Id.* ¶ 35.) She was fired later that afternoon. At the time she was told only that MNPS wanted to go in a "different direction with priority schools." (*Id.*)

This extremely close temporal proximity between McGruder's initial reports, MNPS's beginning an effort to pad her personnel file with negative information, McGruder's final

reports, and her termination, all taking place within a span of five to six weeks, is sufficient to establish a causal connection for purposes of her *prima facie* case.

### 2. The Defendant's Non-Retaliatory Reason for Terminating McGruder

The defendant asserts that the true reason for the plaintiff's termination[4] was her "inability to develop professional relationships"—more specifically that she engaged in rude and unprofessional behavior—as established by the fact that complaints by subordinates and others had been "lodged against her, and thoroughly documented, several weeks *before* she voiced any concerns about discrimination." (Doc. No. 19, at 6.)

In support of this assertion, Metro relies on the Declaration of Chris Henson, who was serving as MNPS Interim Director of Schools in January 2016 when the decision was made to terminate McGruder's employment. According to Henson, McGruder was terminated because MNPS had received multiple complaints against her by other MNPS employees regarding her unprofessional conduct. (Doc. No. 18-7 ¶ 4.) Filed with his Declaration are (1) statements from those individuals who had witnessed an event on October 14, 2015 involving the plaintiff and her assistant, Bettye Ivy, solicited by Jay Steele, then Chief Academic Officer and plaintiff's supervisor,[5] including Marsha Baker (undated), Mary Murphy (dated 10/14/15), and McGruder herself (dated 11/1/15) (Doc. No. 18-6, at 1–4); (2) a 12/9/15 email from Kelli Lorton, MMS Principal, to Katie Cour, responding to McGruder's "Insubordination Memo" (accusing Lorton

---

[4] The plaintiff alleges that she was fired on January 15, 2016 at 4:00 p.m., effective immediately. (Doc. No. 26-1 ¶ 35.) The defendant prefers the term "non-renewal," and it has introduced into the record a letter to McGruder from Chris Henson, then MNPS Interim Director of Schools, dated January 15, 2016, notifying McGruder that her employment would not be renewed for the 2016–2017 school year and that she would be paid through June 30, 2016. (Doc. No. 18-1.) The same letter also states, however, that January 15, 2016 would be her last day at work and that her salary paycheck for January 29, 2016 would contain a "lump sum payment representing the salary [she] would have earned through June 30, 2016," plus vacation pay accrued through that date. (*Id.*)

[5] Steele left his position effective December 4, 2015. (Doc. No. 26-8.)

of insubordination on December 2, 2015) and complaining about McGruder's unprofessional conduct (Doc. No. 18-6, at 5), which Cour forwarded to Vanessa Garcia along with the comment, "Let's discuss this tomorrow. Don't share with Euna [McGruder] yet—but we have a major issue and it's not just Kelli [Lorton]"; (3) McGruder's Insubordination Memo to Kelli Lorton dated 12/3/15, documenting Lorton's alleged insubordination on December 2, 2015 (Doc. No. 18-6, at 9); (4) 12/15/15 email from Jamie Adams to Katie Cour and others, which Cour forwarded to Garcia, providing her version of the December 2 interaction between Lorton and McGruder that was the topic of McGruder's Insubordination Memo (Doc. No. 18-6, at 10–12); (5) 12/21/15 email from Jay Steele to Garcia, subject line "Meetings with Euna," apparently at Garcia's request, documenting three meetings with McGruder to "discuss her behavior" and the necessity of "relationship building," the first meeting being after McGruder's first secretary "decided to take a lower paying job to transfer out of Dr. McGruder's office"; the second, after Dr. Dorothy Gunn resigned rather than continuing to work with the plaintiff; and the third, involving the October 14 incident with Bettye Ivy, the plaintiff's second secretary, which resulted in Ivy's taking medical leave, citing a hostile work environment (Doc. No. 18-6, at 13); (6) 12/22/215 email from Dorothy Gunn, former MNPS Executive Lead Principal, subject line "Requested Information," to Antoinette Williams, Executive Officer, Middle Schools, and forwarded to Garcia, documenting Gunn's reason for retiring from MNPS earlier that semester, after 31 years in numerous capacities, in particular the difficulties she had experienced working with McGruder, her perception that McGruder had behaved unprofessionally on numerous occasions during the early fall of 2015, and her conclusion that working with McGruder was so stressful that it was adversely affecting her health; she concluded that she was unwilling "to

work in adverse conditions at this point in [her] life" (Doc. No. 18-6, at 18);[6] (7) 12/23/15 email from Peggy Brodien, principal of Joelton Middle School, to Williams and Garcia, describing her experience of feeling undermined, unsupported, and belittled while working with McGruder during the late summer and fall of 2015 (Doc. No. 18-6, at 19–20); (8) 12/23/15 email from Jon Hubble, Executive Lead Principal, to Williams and forwarded to Garcia, about his negative experiences working with McGruder (Doc. No. 18-6, at 21); (9) 1/4/16 email from Antoinette Williams to Garcia, regarding her interactions with McGruder in November 2015 (Doc. No. 18-6, at 23); and (10) 1/7/16 email from Michelle McVicker, Principal of Buena Vista Elementary School, to Cour, subject line "Following up on our conversation," documenting her concerns about McGruder's "lack of professionalism, follow through and support overall" and "blatant disregard for district guidelines and procedures for budgetary planning and flexibility, and as well as the state requirements regarding teacher/principal evaluation." (Doc. No. 18-6, at 25–26). The defendant argues that these materials, and particularly the memo by McGruder's supervisor, Chief Academic Officer Jay Steele, showed that "management had already begun counseling [McGruder] on her unprofessional behavior throughout the fall semester." (Doc. No. 19, at 6.)

The defendant has clearly satisfied its burden of articulating a non-retaliatory reason for the decision to terminate McGruder's employment.

### 3.    *Pretext*

The defendant also asserts that the plaintiff cannot establish that this reason is pretextual, because "the complaints against her had arisen and were being documented several weeks before she voiced her concerns on January 8." (Doc. No. 19, at 7.) The defendant further argues that any claim of pretext is undermined by the fact that Jay Steel had met with McGruder three times

---

[6] After McGruder's termination, Gunn was hired in an interim capacity to replace the plaintiff as Executive Officer of Priority Schools. (*See* Doc. No. 27 ¶ 3.)

during the fall of 2015 to discuss her unprofessional behavior.[7]

In her Response, the plaintiff first argues that Garcia's statement to her—that she was being terminated because, "[w]ith everything you were saying about [MMS] and Kelli [Lorton], we just thought it was in the best interest of everybody to go a different direction" (Doc. No. 26-1 ¶ 36)—constitutes direct evidence of retaliation, particularly because Garcia personally recommended her termination and had knowledge that the plaintiff had engaged in protected activity by making the referenced reports. (Doc. No. 28, at 19 (citing *Wexler*, 317 F.3d at 570; *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)).) In addition, McGruder claims that other comments by MNPS agents constitute circumstantial evidence of a retaliatory animus. These comments include: (1) Cour's allegedly instructing her on December 7, 2015 to "tread lightly," because the plaintiff's allegations against Lorton could result in liability for MNPS, "especially if the media found out" (Doc. No. 26-1 ¶ 28); (2) Cour's December 9, 2015 email to Garcia responding to the Insubordination Memo issued to Principal Lorton stating, "Don't share with Euna yet – but we have a major issue and its not just Kelli" (Doc. No. 18-6, at 5); and (3) Garcia's statement to McGruder in response to a mid-December status and findings report that, "I talked to Katie [Cour] . . . and it looks like the whole investigation is just stirring up a hornets' nest" (Doc. No. 26-1 ¶ 30).

The plaintiff also argues that the timing of events indicates pretext, insofar as the complaints on which the defendant relies to justify the termination were not spontaneously submitted. Instead, they were apparently solicited by Garcia and/or Cour shortly after the plaintiff first began to notify them of her investigative findings concerning Kelli Lorton and the conditions at MMS, specifically for the purpose of creating a "paper trail" to justify the

---

[7] The defendant also characterizes these events as "counter-evidence of pretext." (Doc. No. 32, at 5.) Counter-evidence of pretext is not part of the *McDonnell Douglas* analysis.

termination decision to terminate her. (Doc. No. 28, at 20.) McGruder points out that she came to MNPS with over twenty-four years of success in turning around schools and working with disadvantaged student populations. At MNPS, she was given the authority to do "whatever it takes" to achieve her goals and improve school performance, and, during her tenure with MNPS, she had always received positive job performance feedback. (Doc. No. 26-1 ¶¶ 14, 15.) She asserts out that Metro, and MNPS more specifically, has clear guidelines for issuing employee discipline and documenting reprimands—which were not followed in her case. She was also never given the opportunity to respond to the allegations against her or to correct or address the alleged concerns. She generally refutes the "vague and subjective allegations" about her management and communications style and also contends that "it is to be expected that there might be gripes with a new administrator tasked with 'turning around' Nashville's lowest performing schools." (Doc. No. 28, at 23.)

In its Reply, the defendant takes issue with the plaintiff's "mov[ing] her report date back to Dec[ember] 7 or 21," because she stated in her EEOC charge that she expressed her findings to MNPS "on or about January 8, 2016." (Doc. No. 32, at 3.) The defendant argues that the statements in McGruder's Declaration regarding when she first reported potential Title VII violations by Lorton should be stricken insofar as they contradict the statements in her EEOC charge and Complaint.

As an initial matter, the court again rejects the invitation to strike or disregard the plaintiff's Declaration, for the same reasons as those set forth above: under Rule 56(f) the fact that the Declaration is unsigned does not establish that it is so unreliable that the court cannot consider it as a source of evidence for purposes of a motion for summary judgment, and the statements in the Declaration expand upon, rather than contradict, the allegations in the

Complaint and EEOC charge. The plaintiff's credibility can certainly be impeached through questioning at trial about why she did not include certain details at earlier opportunities, but questions about her credibility do not justify striking the Declaration.

Further, the court finds that the evidence in the record, including the plaintiff's Declaration, gives rise to a disputed question of fact as to whether the defendant's proffered reason for terminating the plaintiff is pretextual. First, although "temporal proximity cannot be the sole basis for finding pretext," *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (internal quotation marks omitted), suspicious timing "'is a strong indicator of pretext when accompanied by some other, independent evidence.'" *Id.* (quoting *Bell v. Prefix, Inc.*, 321 F. App'x 423, 431 (6th Cir. 2009)). The temporal proximity in this case is unusually acute. On top of that, the plaintiff alleges that, when she was fired, she was told only that it was because MNPS had decided to go in a "different direction with priority schools." (Doc. No. 26-1 ¶ 36.) A few days later she was allegedly told: "With everything you were saying about Madison and Kelli, we just thought it was in the best interest of everybody to go a different direction." (*Id.*) The fact that the plaintiff was not told at the time of her firing that her allegedly objectionable conduct was the reason lends support to the plaintiff's claim that the reason proffered now is pretextual. Other evidence contributes to that conclusion as well, including that (1) the defendant's agents apparently actively solicited negative statements about the plaintiff's professional conduct around the same time that she allegedly notified the same agents that she believed that staff at MMS were suffering discrimination and a hostile work environment; (2) the plaintiff was never notified about the negative documentation in her file; and (3) the plaintiff was not provided advance warning that her allegedly rude and confrontational conduct was putting her job in jeopardy. Regarding Jay Steele's meetings with her, Steele himself characterized these

discussions as focused on "relationship building" (Doc. No. 18-6, at 13), and the plaintiff apparently did not construe them as counseling sessions or as reprimands (*see* Doc. No. 26-1 ¶¶ 13–15).

In sum, although there is certainly ample evidence in the record from which a jury could conclude that the plaintiff's employment was terminated because of repeated instances of rude, peremptory, and unprofessional conduct, the evidence in the record, viewed in its totality, is sufficient to create a jury question as to whether McGruder's conduct was the but-for reason for her termination, that is, whether the proffered reason for her termination actually motivated the defendant's conduct.

## IV.     CONCLUSION

For the reasons set forth herein, the defendants' Rule 59 motion (Doc. No. 28) will be granted. The Order granting summary judgment (Doc. No. 37) will be vacated in part, and the Motion for Summary Judgment will be denied with respect to the plaintiff's retaliation claim. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge